J. A18001/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DOMINIC S. BURNO, | : | No. 1572 MDA 2015 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, August 26, 2015,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0005415-2014

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND STEVENS,* P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED MARCH 03, 2017**

Appellant, Dominic S. Burno, appeals from the judgment of sentence of 36 months of county intermediate punishment, as well as restitution, a $500 fine, and costs of prosecution, imposed following his conviction of Criminal Trespass -- Building or Occupied Structure, 18 Pa.C.S.A. § 3503(a)(1)(i).[1]  On appeal, appellant raises issues relating to subject matter jurisdiction, sufficiency of the evidence, and the trial court's refusal to answer a question posed by the jury concerning the law of eviction.  For the reasons stated herein, we affirm.

---

* Former Justice specially assigned to the Superior Court.

[1] Appellant's intermediate punishment sentence consists of 3 months in the Dauphin County Work Release Center, followed by 3 months of house arrest, and, finally, 30 months of supervised probation.

The trial court provided a detailed factual background, which we set forth, in pertinent part, as follows:

> A jury trial was held in this matter on August 10-1[2], 2015. The testimony established that, at the time of trial, Donna Rayson-Hutchinson ("Ms. Hutchinson") owned a home at 527 Camp Street, Harrisburg, Pennsylvania, a location where she no longer lives. Ms. Hutchinson described the home as a three story residence . . . .
>
> Sometime in September 2013, Ms. Hutchinson verbally agreed that four people could live in the Camp Street house – Chris Hodges (her nephew), Kayla Hodges (Chris'[s] [w]ife]), Brenda Hoffman (Chris'[s] [m]other-[i]n-[l]aw/Kayla's [m]other)[,] and Dominic Burno ([Ms. Hoffman's] boyfriend). For a short period of time, Ms. Hoffman's younger daughter, Jalyn[,] also lived in the house.
>
> Ms. Hutchinson and Ms. Hoffman worked out an agreement between them which required the new Camp Street residents to pay the monthly mortgage of $540, pay for the utilities used at the home[,] and to make repairs to the residence. According to Ms. Hutchinson, upon walking through the house and seeing the various areas of disrepair, Ms. Hoffman came up with the idea of making the repairs so that the group could move in as soon as possible. Ms. Hutchinson testified that when the group moved in, the repair issues included holes in the floor and ceiling near plumbing where vandals had been searching for copper piping along with mold on the ceiling above the 1st floor shower. Ms. Hoffman stated that, during the walk through, there were no apparent piping issues. Ms. Hutchinson did not receive rent payments from Ms. Hoffman.
>
> Ms. Hoffman testified to her version of the agreement to live in the Camp Street house. Ms. Hoffman stated that [Mr. and Mrs. Hodges] would continue to live there and that she, [a]ppellant[,] and her youngest daughter, Jalyn[,]

would move in. The residents were to pay $500 per month to cover the mortgage along with the utilities. Her understanding with regard to repairs was that they were responsible to patch the existing holes in the walls and ceiling.

According to the residents, between September 2013 and December 2013, several problems arose that necessitated repairs to the house. Brenda Hoffman had previously been in the house when only Chris and Kayla Hodges lived there. She also walked through the house in September 2013, at which time she decided to move in. Ms. Hoffman described smashed steps on the porch, holes in the ceilings but [] no obvious piping problem.

At the trial, Ms. Hoffman described the problems that arose after moving into the Camp Street house. She said that due to a leak in a bathroom on the third floor, water was dripping into the second floor bathroom and, eventually, part of the ceiling collapsed. Ms. Hoffman stated she discovered the second floor bathroom leaking through the walls into the dining room causing a wet spot on the wood floor. A friend of Ms. Hoffman's plugged the leak and used a heater to dry the floor.

In the same area of the dining room, Ms. Hoffman observed what she described as mushrooms growing on the wall after discovering a wet rug near the table. She observed the same growth on the walls in the basement when she went down to explore the source of the moisture. A plumber eventually determined that a leak was running from the second floor bathroom through the walls and doorframe of the first floor bathroom which caused the "mushrooms" and wet rug. The ceiling in the first floor [] bathroom [later] collapsed. Ms. Hoffman testified that she and [a]ppellant were paying for all of the repair bills.

Later in December, the residents began smelling a foul odor. In the basement[,] a problem

was uncovered with the sewage pipes. The basement floor had to be dug up and the drains unclogged by a plumber at the cost of approximately $2,200.00. Ms. Hoffman's father, John Hoffman, testified to his involvement in repairing plumbing problems in the house. He replaced a pipe to stop the leak from the second floor bathroom into the dining room and he tried to work on the clogged line in the basement but [] determined that the problem required a professional plumber.

Ms. Hoffman conceded that the group had only made one mortgage payment and a late fee in October. In December, Ms. Hoffman had a conversation with Ms. Hutchinson during which she stated that Ms. Hutchinson had to pay for any further repairs. According to Ms. Hoffman, Ms. Hutchinson refused to pay for repairs and stated that she was going to increase the monthly payment to cover a mortgage escrow account shortage. Ms. Hoffman testified that she would be unable to pay the increased amount and continue to pay for repairs. According to Ms. Hoffman, [Ms.] Hutchinson indicated that, if the residents could not pay an increased amount and pay for repairs, she would close the house and let the mortgage company take it. Ms. Hoffman responded by stating that she was done with the arrangement and that they would be leaving. Ms. Hoffman, Mr. Hodges and Ms. Hodges moved out in February 2014. Mr. Hoffman stated that he helped Ms. Hoffman, [and Mr. and Mrs. Hodges] move out of the Camp Street house and into his own house in February 2014. He said that [a]ppellant did not come with the rest.

Ms. Hutchinson testified that the December encounter with Ms. Hoffman was a heated discussion that resulted in her telling them all to leave the house. Based on information from her nephew, Chris Hodges, all of the residents were moving out by February 1, 2014, so she proceeded as if it were true. Ms. Hutchinson testified that she explicitly told them all to leave.

Following a trip to Jamaica, Ms. Hutchinson returned to the Camp Street house in early March 2014, where she discovered [a]ppellant in a bedroom with a broken leg. She also saw his personal belongings and mail in the mailbox addressed to him. Appellant told her that Chris Hodges said he had her permission to stay as he had nowhere to go while recuperating. Ms. Hutchinson denied this was true especially since she did not have a phone number for [Mr. Hodges] at the time. Ms. Hutchinson said [a]ppellant had to be out before she returned to the residence.

Ms. Hutchinson returned to the Camp Street house again in May 2014, when she discovered that the room where [a]ppellant had been staying was still occupied and additional personal property was present that she had not seen before. While there, she had occasion to wash her hands which caused her to realize that the water service was on. This discovery prompted her to contact the City of Harrisburg to have the water service turned off.

In July 2014, Ms. Hutchinson went to the house with one Quentin Payne ("Mr. Payne"), a friend she hires for construction work and home repairs, for the purpose of repairing the porch steps. She discovered that [a]ppellant was still living in the house. Ms. Hutchinson told him that he had to leave but [a]ppellant refused. After exchanging words, Ms. Hutchinson called the police who informed her that they could not assist her because they deemed the situation to be a landlord/tenant issue. Additionally, [a]ppellant would not let Mr. Payne perform the work saying it was his electricity and it was not for use. Mr. Payne stated that [a]ppellant acted as if he owned the property. Ms. Hutchinson also learned that the water service had been turned on without her authorization again; therefore, she contacted the City to terminate service.

At the time she was interacting with [a]ppellant, two other unknown men arrived at the house and attempted to enter. As the men passed

her, Ms. Hutchinson tried to verbally and physically prevent them from entering the house. They responded by saying that they lived there as they rented from [a]ppellant. Mr. Payne also testified to this fact. She also testified that [a]ppellant stepped forward during the interaction and instructed the men to only deal with him. After the July visit, Ms. Hutchinson had Mr. Payne change the door locks and screw down the windows of the house.

Ms. Hutchinson once again returned to the house in September 2014. The door was locked and she did not have a key. She proceeded to go to a Magisterial District Justice's ("MDJ") office only to be told that it was a housing problem. Ms. Hutchinson tearfully explained the entire story to the office personnel there and, when the manager became involved, her name and phone number were taken and she was told that someone would be in touch with her.

Ms. Hutchinson was later contacted by Detective William Jackson ("Det. Jackson"), an investigator with the Dauphin County District Attorney's Office. Det. Jackson explained that he had received information about Ms. Hutchinson's problem from the MDJ's office manager. He considered the call an "on-the-street" complaint and, after review of the possible merits with the District Attorney's office, he set out to investigate further. He began by reviewing Ms. Hutchinson's call to 911 made on July 8, 2014, during which the dispatcher told her it was a housing complaint. The pair later met so Ms. Hutchinson could provide a statement. [Det.] Jackson then made arrangements to meet [a]ppellant at the Camp Street residence. Det. Jackson and Ms. Hutchinson entered the house and observed [a]ppellant's personal property. Appellant was not there but a note was attached to the front door that said either "Dominic" or "Burno" and listed a phone number.

Det. Jackson called the number on the note and reached a person who identified himself as

- 6 -

[a]ppellant. When asked why he was still in the house, [a]ppellant responded by "ranting and raving" about how Ms. Hutchinson knew he was still there as she had let him stay in the house. While this interaction was happening, Ms. Hoffman unexpectedly arrived to retrieve [a]ppellant's property. When questioned about [a]ppellant's living arrangements, Ms. Hoffman told Det. Jackson that she thought he had moved out in February when the rest of them had moved. Upon examination of the house, Det. Jackson observed empty screw holes in windows where Mr. Payne had drilled them. He also agreed that a person could gain access to the house by way of the balconies on the first and second floor without force.

Trial court opinion, 3/8/16 at 2-8.

Following a jury trial, appellant was found guilty of criminal trespass. On August 26, 2015, the trial court imposed the above-stated sentence on appellant. Appellant subsequently filed a notice of appeal and a timely concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). In his appellate brief, appellant presents three issues for our review:

1. Did the trial court err where it denied [appellant's] omnibus pretrial motion to dismiss charges for lack of subject matter jurisdiction, pursuant to the Landlord Tenant Act (68 P.S. § 250.101)?

2. Was the evidence at trial insufficient to sustain [] appellant's conviction for the charge of criminal trespass where the evidence showed that appellant was a tenant of the residence at issue and had not been properly evicted pursuant to the Landlord Tenant Act (68 P.S. § 250.101)?

> 3. Did the trial court err where it denied [appellant's] request to answer the jury's question of law regarding a tenant's rights as they apply to an eviction proceeding?

Appellant's brief at 7 (unnecessary capitalization and emphasis omitted).

We first review whether the trial court erred when it denied appellant's motion to dismiss the charges for lack of subject matter jurisdiction. We note that "[i]ssues pertaining to jurisdiction are pure questions of law, and an appellate court's scope of review is plenary. Questions of law are subject to a *de novo* standard of review." *Robert Half Int'l, Inc. v. Marlton Technologies, Inc.*, 902 A.2d 519, 524 (Pa.Super. 2006) (*en banc*) (internal citations omitted). Here, appellant argues that because "the underlying issue in this case is that of a landlord and tenant complaint, which had not yet been filed with the appropriate magisterial office, let alone resolved, the Commonwealth and therefore the trial court lacked jurisdiction to proceed on this matter in a criminal court." (Appellant's brief at 13.) Appellant asserts that "[p]roper jurisdiction for all [l]andlord and [t]enant matters is before a Justice of the Peace and not the Court of Common Pleas." (*Id.*)

"Subject matter jurisdiction relates to the competency of a court to hear and decide the type of controversy presented. Jurisdiction is a matter of substantive law." *Commonwealth v. Bethea*, 828 A.2d 1066, 1074 (Pa.Super. 2003). Further, "[e]xcept where exclusive original jurisdiction of an action or proceeding is by statute or by general rule . . . vested in

another court of this Commonwealth, the courts of common pleas shall have unlimited original jurisdiction of all actions and proceedings, including all actions and proceedings heretofore cognizable by law or usage in the courts of common pleas." *See* 42 Pa.C.S.A. § 931(a). Our supreme court has stated that "[c]ontroversies arising out of violations of the Crimes Code are entrusted to the original jurisdiction of the courts of common pleas for resolution." *Bethea*, 828 A.2d at 1074, citing 18 Pa.C.S.A. § 102. *See also Commonwealth v. Seiders*, 11 A.3d 495, 497 (Pa.Super. 2010) ("All jurists within that tier [(courts of common pleas)] of the unified judicial system are competent to hear and resolve a matter arising out of the Crimes Code." (citations omitted)).

Regardless of whether Ms. Hutchinson could have filed a landlord/tenant action seeking appellant's eviction in magisterial district court, the Commonwealth ultimately charged appellant with criminal trespass, a violation of the Crimes Code entrusted to the original jurisdiction of the courts of common pleas. *See Bethea*, *supra*. Accordingly, we cannot conclude that the trial court erred when it denied appellant's omnibus pretrial motion to dismiss the charges for lack of subject matter jurisdiction, particularly because the Commonwealth, and not Ms. Hutchinson, brought this action against appellant.

Next, we consider whether the evidence at trial was sufficient to sustain appellant's conviction of criminal trespass. Specifically, appellant

contends that "because [he] was never served with written notice of eviction and afforded his rights as a tenant, he maintained his license and privilege to reside within the Camp Street residence." (Appellant's brief at 18.)

> In considering this challenge to appellant's conviction, we are mindful that our review is limited. In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the crime charged beyond a reasonable doubt.

*Commonwealth v. Namack*, 663 A.2d 191, 193 (Pa.Super. 1995), citing

*Commonwealth v. May*, 656 A.2d 1335 (Pa. 1995) (emphasis deleted).

Criminal trespass is defined, in relevant part, as follows:

**(a)  Buildings and occupied structures.--**

> (1)  A person commits an offense if, knowing that he is not licensed or privileged to do so, he:
>
> > (i)  enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof[.]

18 Pa.C.S.A. § 3503(a)(1)(i). "The crime of [criminal] trespass thus includes an element of intent or ***mens rea***." ***Namack***, 663 A.2d at 194, citing ***Commonwealth v. Carter***, 393 A.2d 660 (Pa. 1978) (additional citation omitted). "This element of intent, like every other element of the

- 10 -

crime, must be proven beyond a reasonable doubt if the conviction is to survive a challenge to the sufficiency of the evidence." *Id.*

"The crime of criminal trespass involves either entering or remaining in a place, while knowing that one is not licensed or privileged to do so." ***Commonwealth v. Walker***, 559 A.2d 579, 582 (Pa.Super. 1989). "The purpose of the criminal trespass statute is to prevent unlawful intrusion onto real property or remainder thereon or to prevent unlawful breaches of the peace relating to realty." ***Commonwealth v. White***, 492 A.2d 32, 36 (Pa.Super. 1985).

As recounted in the trial court's recitation of the facts, this was an oral, month-to-month lease agreement between Ms. Hutchinson, the owner of the property, and Ms. Hoffman. (***See*** trial court opinion, 3/8/16 at 10 ("Appellant did not verbally participate in setting the terms of the agreement between Ms. Hutchinson and Ms. Hoffman despite being present for the conversation.").) Appellant was, at best, a sub-tenant of Ms. Hoffman. The lease was terminated in December 2013 when Ms. Hoffman indicated that she could no longer afford to pay for the extensive repairs necessary to make the property habitable. All of the tenants, including Ms. Hoffman, vacated the property by February 2014; however, appellant remained behind.

In the months that followed, appellant was told multiple times by Ms. Hutchinson to vacate the premises, but he refused. The water was shut

off because the property was considered to be vacant; however, appellant turned it back on from the curb using illegal methods. (***Id.*** at 8-9.) Ms. Hutchinson had her contractor, Mr. Payne, board up the windows and screw them shut; appellant removed the screws. Ms. Hutchinson changed the locks, but appellant continued to live in the house, even sub-letting the property to unknown individuals. At this point, appellant was essentially a squatter with no legal right to remain on the premises. Appellant was not paying rent or making the mortgage payments, nor was he making repairs to the property.

As the trial court observed, "Review of the record shows that the agreement for anyone to live in the house was made between Hutchinson and Hoffman and that agreement ended as of February 2014." (Trial court opinion, 3/8/16 at 15.) "The only evidence presented to dispute the Commonwealth's case was [a]ppellant's testimony which was internally inconsistent." (***Id.***) Even assuming, ***arguendo***, that a landlord/tenant relationship existed at one time between Ms. Hutchinson and appellant, we reject the argument that without a formal eviction notice, appellant somehow remained licensed or privileged to remain in the house. Appellant was told repeatedly to vacate the premises and he refused.

The case of ***Commonwealth v. Groft***, 623 A.2d 341 (Pa.Super. 1993), is instructive. In ***Groft***, the 56-year-old defendant had been living continuously in his mother's home for 25-30 years. ***Id.*** at 344. In fact, he

had contributed money towards the purchase of the land and helped his father and brother construct the house. *Id.* However, the title to the home was vested in the defendant's mother, and he had no ownership interest. *Id.* For a period of 4-5 years prior to trial, the defendant and his mother had not gotten along, and she, as well as other family members, had told the defendant on numerous occasions that he should move out and find his own place. *Id.* However, the defendant refused. *Id.*

This court found the evidence was sufficient to support the defendant's conviction of defiant trespass pursuant to 18 Pa.C.S.A. § 3503(b)(1)(i), rejecting the defendant's argument that he lacked the requisite intent where he had been told repeatedly to leave his mother's home. *Groft* at 344. In addition, the *Groft* court was not convinced by the defendant's claim that the dispute should have been addressed in a civil action rather than in criminal court:

> While it may be true, as appellant suggests, that a civil action could have been brought by his mother, this does not necessarily make inappropriate a criminal prosecution based upon the same events. The subject matter addressed in a civil lawsuit and a criminal prosecution do not have to be mutually exclusive. Rather, "it is elementary that a person may offend against the Commonwealth and also be liable for civil damages or other relief growing out of the same offense." *Pearl Assurance Co. v. National Insurance Agency*, 151 Pa.Super. 146, 157, 30 A.2d 333, 338 (1943). *See also*: 1 Pa.C.S. § 1929. Because there was sufficient evidence that appellant did, in fact, commit the crime of defiant trespass, it cannot be said that the criminal process was abused by the instant prosecution.

*Id.* at 344-345.

We acknowledge that self-help evictions are disfavored in the law. *See Lenair v. Campbell*, 31 Pa. D.& C.3d 237, 242 (Pa.Com.Pl. 1984) (the legislature envisioned the Landlord Tenant Act as a "complete and exclusive remedy for a landlord seeking to vindicate his rights"); *see also O'Brien v. Jacob Engle Found, Inc.*, 47 Pa. D.&C.3d 557, 560 (Pa.Com.Pl. 1987). However, as stated above, the Commonwealth decided to charge appellant criminally in this case. Appellant cites no authority for the proposition that if Ms. Hutchinson could have filed a landlord/tenant action seeking appellant's eviction in magisterial district court, her failure to do so foreclosed alternative means of redress, including criminal charges. Ultimately, it was the Commonwealth that made the decision to charge appellant with criminal trespass, a violation of the Crimes Code.

When the evidence is viewed most favorably to the Commonwealth, as is our standard of review, it fully supports the conclusion that appellant knew he was not licensed or privileged to remain on the property but persisted in doing so nonetheless, thereby exposing himself to criminal liability. Appellant's sufficiency of the evidence claim fails.

Regarding appellant's third issue, that the trial court abused its discretion by refusing to answer the jury's question regarding eviction, we agree with the trial court that the question was irrelevant. The jury's question was, "Does a homeowner have a right to lawfully evict a person

without filing paperwork[?]" (Notes of testimony, 8/10-12/15 at 291-292.) As the trial court explained, "[T]he trial in this matter concerned a criminal prosecution for trespass[,] not a civil matter disposing of a landlord/tenant dispute. Accordingly, the Landlord Tenant Act and any eviction procedures provided therein are not implicated in any way in the criminal prosecution of [a]ppellant." (Trial court opinion, 3/8/16 at 16-17 (footnote omitted).) We agree. Having determined that appellant's issues on appeal are without merit and do not afford him relief, we will affirm the judgment of sentence.

Judgment of sentence affirmed.

Stevens, P.J.E. joins this Memorandum.

Bender, P.J.E. files a Concurring and Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/3/2017